999 A.2d 1066

**JOHN L. MATTINGLY CONSTRUCTION CO., INC.**

**v.**

**HARTFORD UNDERWRITERS INSURANCE COMPANY.**

**Wilma L. Phoebus, d/b/a Phoebus Electric Company**

**v.**

**Hartford Underwriters Insurance Company.**

**Nos. 136, 144 Sept. Term, 2009.**

Court of Appeals of Maryland.

July 27, 2010.

314

316

David E.C. Grant (O'Conor, Grant & Samuels of Towson, MD), on brief, for petitioners in No. 136, Sept. Term, 2009.

Edward A. Jaeger, Jr. (White and Williams LLP of Philadelphia, PA), on brief, for respondent in Nos. 136 and 144, Sept. Term, 2009.

Sara Anderson Frey (Josh M. Greenbaum of Cozen O'Connor of Philadelphia, PA; Michael J. Schreyer of Seidman & Schreyer, LLC of Waldorf, MD), on brief, for petitioner in No. 144, Sept. Term, 2009.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY and BARBERA, JJ.

BATTAGLIA, J.

In this certiorari case, we are called upon to address whether ambiguity exists in a waivers of subrogation clause in a form contract governing the construction of a restaurant. We have compressed the various questions into one, that being:

> Was the Circuit Court correct in granting summary judgment against an insurer on the basis that a waivers of subrogation clause in a form contract plainly and unambiguously encompassed losses sustained after completion of construction and final payment, rather than solely during construction?

*Mattingly Constr. v. Hartford,* 411 Md. 598, 984 A.2d 243 (2009),[1] *Phoebus v. Hartford,* 411 Md. 599, 984 A.2d 243

---

**1.** Petitioner, John L. Mattingly Construction Co., Inc., presented the following questions in its Petition for Writ of Certiorari:

 I. When the standard AIA Document A107–1997 imposes no temporal limitation on waivers of subrogation, can a Maryland Court disregard the clear language of the contract and impose such a temporal limitation that precludes application of waivers of subrogation to post-construction losses absent any ambiguity in the contract language?

 A. Are parties to a construction contract able to freely negotiate the allocation of risks to insurers to the extent such risks are covered by insurance without regard to temporal limitations?

 B. Does a waiver of subrogation provision in the standard AIA Contract between owner and contractor unlawfully impair the rights of subsequent insurers of the subject property?

(2009).[2] The Circuit Court for Calvert County determined that ambiguity did not exist and granted the contractor's and subcontractor's motions for summary judgment, but we disagree and shall hold that the waivers of subrogation clause was ambiguous and requires further elucidation on remand.

## Background and Procedural History

Our focus is whether a waivers of subrogation clause in a form contract, between the contractor and the owner of the real property and the restaurant to be constructed, encompasses losses sustained after completion of construction and final payment.[3] "Subrogation," in this regard, is defined as "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Black's Law Dictionary 1563–64 (9th ed. 2009). In the insurance context, "[a]n insurer asserting a subrogation right is usually viewed as 'standing in the shoes' of the insured so that the insurer's rights are equal to, but no greater than, those of the insured." Robert E. Keeton and Alan I. Widiss, *Insurance*

---

C. Do waivers of subrogation without temporal limitation violate public policy?
II. Did the Court of Special Appeals err by looking for extrinsic evidence beyond the four corners of the contract when the Contract language was clear and unambiguous simply because no Maryland cases had previously interpreted the phrase "other property insurance applicable to the Work"?
A. Did the Court's decision render the contract AIA document phrase "other property insurance applicable to the Work" meaningless, in contravention of the basic principles of contract interpretation?

2. Petitioner, Wilma L. Phoebus, d/b/a Phoebus Electric Co., presented the following questions in its Petition for Writ of Certiorari:
 1. Where the language of the contract itself is clear and unambiguous, may a court look to extrinsic evidence beyond the four corners of the contract to find an ambiguity?
 2. Whether, as a matter of first impression in this state, a waiver of subrogation provision in a contract applies to post-construction losses, where the clear and plain language of the contract does not impose a temporal limitation?

3. The enforceability of the waivers of subrogation clause for losses occurring during construction is not at issue in the present case.

*Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices* § 3.10, at 219 (student ed. 1988); *see also Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 312, 936 A.2d 343, 362 (2007) ("Subrogation is the substitution of one person to the position of another, an obligee, whose claim he has satisfied . . . .") (internal quotations omitted).

 "Waivers of Subrogation," or waivers of the opportunity to make subrogation claims, which are prevalent in construction contracts, have been aptly described by our intermediate appellate court in this case as follows:

Waivers of Subrogation clauses commonly appear in construction contracts. "Construction contracts often contain provisions which require the parties to waive their right to claim damages against one another up to the amount of insurance coverage available for their losses." 4 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER & O'CONNOR ON CONSTRUCTION LAW § 11:100, at 306 (2002). A subrogation waiver "is a risk-shifting provision premised upon the recognition that it is economically inefficient for parties to a contract to insure against the same risk." *TX. C.C., Inc. v. Wilson/Barnes Gen. Contractors, Inc.,* 233 S.W.3d 562, 567 (Tex.App.2007). As a matter of policy,

subrogation waiver[s] encourage[ ] parties [to a construction contract] to anticipate risks and to procure insurance covering those risks and also facilitate[ ] and preserve[ ] economic relations and activity. Because a property owner can generally acquire insurance to protect the property against fire and other perils, in the context of a construction contract, the waiver of subrogation clause shifts the ultimate risk of loss resulting from such perils to the owner to the extent damages are covered by insurance . . . .

*Id.* at [567] (citations omitted). Generally, waivers of subrogation clauses are included in construction contracts "to cut down the amount of litigation that might otherwise arise due to the existence of an insured loss." 4 BRUNER & O'CONNOR, supra, § 11:100, at 306–07.

*Hartford Underwriters Ins. Co. v. Phoebus*, 187 Md.App. 668, 677, 979 A.2d 299, 304–05 (2009). Within this framework, we consider the factual circumstances underlying the present controversy.

In 2002, K.B.K., Inc. and John L. Mattingly Construction Co., Inc., Petitioner, entered into an American Institute of Architects ("AIA")[4] form contract number A107–1997,[5] to build an Arby's Restaurant in Dunkirk, Maryland. The contract designated K.B.K. as the "Owner" and Mattingly as the "Contractor" and provided that "the Project is" the Arby's Restaurant in Dunkirk. Section 16.4, governing "Property Insurance," required K.B.K. to "purchase and maintain" property insurance "until final payment has been made" or "until no person ... other than [K.B.K.] ha[d] an insurable interest in the property":

> 16.4.1. *Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance on an "all-risk" policy form,* including builder's risk, in the amount of the initial Contract Sum, plus the value of subsequent modifications and cost of materials supplied and installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Paragraph 14.5 or until no person or entity other

---

**4.** The American Institute of Architects is a professional membership association that publishes "more than 100 forms and contracts used in the design and construction industry." The American Institute of Architects, http://www.aia.org/about/index.htm (last visited July 23, 2010).

**5.** Form contract number A107–1997 is entitled: "Abbreviated Standard Form of Agreement Between Owner and Contractor for Construction Projects of Limited Scope Where the basis of payment is a STIPU-LATED SUM."

than the Owner has an insurable interest in the property required by this Paragraph 16.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors, and sub-subcontractors in the Project.

(Emphasis added). Section 16.5, governing "Waivers of Subrogation," stated that K.B.K. and Mattingly "waive[d] all rights against . . . each other and any of their subcontractors" for damages "covered by property insurance . . . applicable to the Work":

16.5.1 The Owner and Contractor waive all rights against . . . each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other causes of loss *to the extent covered by property insurance obtained pursuant to Paragraph 16.4 or other property insurance applicable to the Work,* except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. . . . The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

(Emphasis added). "The Work" was defined in Section 6.3 of the contract as follows:

The term "Work" means the construction and services required by the Contract Documents, *whether completed or partially completed,* and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. *The Work may constitute the whole or a part of the Project.*

(Emphasis added). Section 14.5, governing "Final Completion and Final Payment," provided that final payment by K.B.K. constituted a waiver of claims, with limited exceptions:

14.5.3 The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1 liens, claims, security interests or encumbrances arising out of the Contract and unsettled;

.2 *failure of the Work to comply with the requirements of the Contract Documents;* or

.3 terms of special warranties required by the Contract Documents.

(Emphasis added).

Mattingly hired several subcontractors, including Wilma L. Phoebus d/b/a Wilma Phoebus Electric Company, the other Petitioner herein, which performed electrical work. Although Phoebus was not a party to the K.B.K.—Mattingly contract, Section 10.3 of the K.B.K.—Mattingly contract provided that subcontractors, such as Phoebus, were entitled to "all rights, remedies, and redress afforded" to Mattingly:

10.3 Contracts between the Contractor and Subcontractors shall (1) require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by the Contract Document, assumes toward the Owner and Architect, and (2) *allow the Subcontractor the benefit of all rights, remedies and redress afforded to the Contractor by these Contract Documents.*

(Emphasis added).

Construction was completed and the restaurant opened for business in October, 2003, after which K.B.K. made final payment on the contract. Subsequently, K.B.K. purchased from Hartford Underwriters Insurance Company, Respondent, a policy of property insurance insuring the restaurant,[6]

---

**6.** Property insurance is defined as "[a]n agreement to indemnify against property damage or destruction." Black's Law Dictionary 875 (9th ed.

with effective coverage dates of October 1, 2004, through October 1, 2005.

Sixteen months after final payment was made, on May 8, 2005, a fire broke out, causing substantial damage to the Arby's. K.B.K. submitted a claim to Hartford for property damage totaling $1,117,711.26, which Hartford paid, less a $1,000 deductible. Thereafter, Hartford, as subrogee [7] of K.B.K., filed a complaint against Mattingly and Phoebus in the Circuit Court for Calvert County, alleging negligence, breach of contract, and breach of warranty, asserting that the "failure of electrical wiring within the Arby's Restaurant" caused the fire.[8]

Mattingly and Phoebus answered, generally denying liability and asserting various affirmative defenses. Thereafter, Petitioners filed motions for summary judgment, asserting that the waivers of subrogation clause, Section 16.5 in the AIA form contract, precluded Hartford's claim. Specifically, Mattingly and Phoebus argued that "the parties agreed to look solely to the insurance" to cover perils such as fire, and therefore, Hartford could not enforce any subrogation rights. Hartford opposed the motions and also filed a cross-motion for partial summary judgment, asserting that the waivers of subrogation provision was not applicable, because K.B.K., its insured, sustained the loss after completion of construction and final payment. Mattingly filed a reply and opposition to

---

2009); *see also* 1 Rowland H. Long, The Law of Liability Insurance § 1.04[2] (2010).

**7.** A "subrogee" is defined as "[o]ne who is substituted for another in having a right, duty, or claim," especially "the person or entity that assumes the right to attempt to collect on another's claim against a third party by paying the other's claim-related debts or expenses." Black's Law Dictionary 1564 (9th ed. 2009).

**8.** On May 4, 2007, Hartford filed an amended complaint adding Atlantic Design & Construction, Ltd. ("Atlantic"), a carpentry subcontractor, as a defendant. Although Atlantic was served with the amended complaint, no answer was filed, and the Circuit Court entered a judgment of default, which Atlantic did not move to vacate. The judgment against Atlantic is not in issue in the present case.

Hartford's cross-motion for partial summary judgment, and Phoebus filed a supplemental memorandum in support of its motion for summary judgment.

After a hearing on the motions, the judge issued an opinion and order granting summary judgment in favor of Mattingly and Phoebus and denying Hartford's cross-motion for partial summary judgment. The judge determined that the waivers of subrogation clause was clear and unambiguous because the term "the Work" in Section 6.3 of the form contract included "the building as constructed, even after final payment." The judge also reasoned that because the damage caused by the fire was covered by "other insurance applicable to the Work," a phrase in Section 16.5 of the contract, K.B.K., and consequently, Hartford waived any rights against Mattingly and Phoebus.

Hartford noted a timely appeal to the Court of Special Appeals, which reversed and remanded in a reported opinion, *Hartford Underwriters Ins. Co. v. Phoebus,* 187 Md.App. 668, 979 A.2d 299 (2009), in which it concluded that the waivers of subrogation provision, read in tandem with the definition of "the Work," was ambiguous and "reasonably [could] be read to have more than one meaning, temporally." *Id.* at 685, 979 A.2d at 309.

We agree with the Court of Special Appeals that summary judgment in favor of Mattingly and Phoebus was improper, because the waivers of subrogation clause was ambiguous as to whether it encompassed losses sustained after completion of construction and final payment; we add our two cents, nevertheless, regarding the path that should be followed by the Circuit Court on remand.

**Standard of Review**

The entry of summary judgment is governed by Rule 2–501, which states in relevant part:

(f) **Entry of judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any

material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

As we recently stated in *Blondell v. Littlepage*, 413 Md. 96, 991 A.2d 80 (2010), the standard of review of a grant of such a motion is as follows:

In considering a trial court's grant of a motion for summary judgment, this Court reviews the record in the light most favorable to the non-moving party. *Anderson v. Council of Unit Owners of Gables on Tuckerman Condominium*, 404 Md. 560, 570–71, 948 A.2d 11, 18 (2008); *Rodriguez v. Clarke*, 400 Md. 39, 926 A.2d 736 (2007); *Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508, 518 (2007) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party."); *Harford County v. Saks*, 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a trial court's decision on a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party."); *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 728 (2001) (In reviewing a grant of the defendants' motions for summary judgment, "we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs."). If no material facts are in dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law. *Anderson*, 404 Md. at 571, 948 A.2d at 18; *Rodriguez*, 400 Md. at 70, 926 A.2d at 754; *Saks*, 399 Md. at 82, 923 A.2d at 6; *Property and Casualty Ins. Guaranty Corp. v. Yanni*, 397 Md. 474, 480–81, 919 A.2d 1, 5 (2007); *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006). On appeal from an order entering summary judgment, we review "only the grounds upon which the trial court relied in granting summary judgment." *Rodriguez*, 400 Md. at 70, 926 A.2d at 754, quoting *Standard Fire*, 395 Md. at 450, 910 A.2d at 1079; *Eid v. Duke*, 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting *Lovelace*, 366 Md. at 695, 785 A.2d at 729.

*Id.* at 110, 991 A.2d at 88, quoting *Gourdine v. Crews,* 405 Md. 722, 735–36, 955 A.2d 769, 777–78 (2008).

**Discussion**

 Mattingly and Phoebus assert that the waivers of subrogation clause in Section 16.5 of the contract clearly and unambiguously encompassed losses sustained after substantial completion of the Arby's and final payment. Petitioners claim that the phrase "other property insurance applicable to the Work" in Section 16.5 refers to both ongoing construction as well as the completed restaurant, as evidenced by the definition of "the Work" in Section 6.3. Mattingly and Phoebus also cite decisions from other jurisdictions which they claim support the notion that subrogation waivers clearly encompass post-construction losses.

Hartford counters that the contract is "vague and ambiguous" regarding whether the waivers of subrogation provision remained in force after the completion of the restaurant and that the "most reasonable interpretation" is that the waiver "was not intended to apply to losses that occur many months or years after substantial completion and final payment." Hartford further asserts that decisions from other jurisdictions cited by Mattingly and Phoebus are inapposite, because those courts interpreted different AIA form contracts from the instant one in that they included provisions specifically addressing what to do in the event of damages occurring after construction was completed and final payment made.

 In interpreting the contract in issue, we are mindful that "Maryland adheres to the principle of the objective interpretation of contracts." *Clancy v. King,* 405 Md. 541, 557, 954 A.2d 1092, 1101 (2008), quoting *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700, 709 (2007). Our task in determining the meaning of a contract is necessarily "focused on the four corners of the agreement." *Clancy,* 405 Md. at 557, 954 A.2d at 1101, quoting *Cochran,* 398 Md. at 17, 919 A.2d at 710. "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy–Lene*

*of Washington, Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 167, 829 A.2d 540, 546 (2003); *accord Langston v. Langston,* 366 Md. 490, 506, 784 A.2d 1086, 1095 (2001). In contrast, a contract is "ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy–Lene,* 376 Md. at 167, 829 A.2d at 547; *see also Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358, 363 (1999) ("Under the objective view, a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning."). "If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Sy–Lene,* 376 Md. at 167–68, 829 A.2d at 547, quoting *County Comm'rs of Charles County v. St. Charles Assocs. Ltd. P'ship,* 366 Md. 426, 445, 784 A.2d 545, 556 (2001). "It is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument." *Burroughs Corp. v. Chesapeake Petroleum & Supply Co., Inc.,* 282 Md. 406, 411, 384 A.2d 734, 737 (1978).

Section 16.5, governing "Waivers of Subrogation," stated that K.B.K. and Mattingly "waive[d] all rights against … each other and any of their subcontractors" for damages caused by perils such as fire "to the extent covered by property insurance obtained pursuant to [Section] 16.4 or *other property insurance applicable to the Work* …." (emphasis added). The issue is whether property insurance underwritten by Hartford, secured after completion of the restaurant, comes within this phrase, "other property insurance applicable to the Work," abrogating any rights of subrogation. Mattingly and Phoebus assert that this language plainly refers to the construction period as well as the completed restaurant, such that K.B.K. waived subrogation rights, without any temporal limitation to the clause whatsoever. Hartford counters that the use of the phrase "the Work" varies throughout the contract, such that the waivers of subrogation clause is rendered ambiguous.

"[T]he Work" is defined in Section 6.3 of the form contract as follows:

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

In the first sentence of the definition, the phrase "construction and services required by the Contract" clearly refers to the construction period. The next phrase, "whether completed or partially completed," however, could yield a different understanding because it could refer reasonably to the completed restaurant.

The second sentence of the definition, which states, "[t]he Work may constitute the whole or a part of the Project," also could be construed to modify the prior phrase to include all actions necessary to constitute performance under the contract. On the other hand, this phrase could be interpreted reasonably to refer to the completed Arby's restaurant.

As a result, the waivers of subrogation clause, including "other property insurance applicable to the Work," may refer reasonably to "other property insurance applicable" to the ongoing construction, or, "other property insurance applicable" to the completed Arby's. Thus, the waivers of subrogation clause, in which the words "the Work" are prominent, is internally inconsistent, and ergo, ambiguous, as also recognized by our colleagues on the intermediate appellate court.

Section 14.5, governing "Final Completion and Final Payment," exacerbates this ambiguity contextually. The provision states that by making final payment, K.B.K. does not waive any claim that "the Work" does not comply with the contract. As noted by the intermediate appellate court, the clause "references the future," because "any such claim necessarily would be made" after the restaurant "is built and paid for." *Hartford*, 187 Md.App. at 686, 979 A.2d at 310. That Section, however, does not indicate the precise meaning of "the Work,"

or whether, in the event of a claim by K.B.K., the "Waivers of Subrogation" Section would remain in force.

Mattingly and Phoebus, nevertheless, refer us to what they term a "majority" of jurisdictions that recognize waivers of subrogation in AIA form contracts as encompassing losses sustained after completion of construction and final payment. *See Town of Silverton v. Phoenix Heat Source Sys., Inc.,* 948 P.2d 9 (Colo.App.1997); *Colonial Prop. Realty Ltd. P'ship v. Lowder Constr. Co., Inc.,* 256 Ga.App. 106, 567 S.E.2d 389 (2002); *TX. C.C., Inc. v. Wilson/Barnes Gen. Contractors, Inc.,* 233 S.W.3d 562 (Tex.App.2007); *Argonaut Great Cent. Ins. Co. v. DiTocco Konstruction, Inc.,* No. 06–1488, 2007 WL 4554219, 2007 U.S. Dist. LEXIS 93846 (D.N.J. Dec. 20, 2007); *Royal Surplus Lines Ins. Co. v. Weis Builders, Inc.,* No. 04–440–C, 2006 WL 897078, 2006 U.S. Dist. LEXIS 16316 (W.D.Ky. Apr. 3, 2006); *American Guarantee and Liab. Ins. Co. v. ADP Marshall, Inc.,* 2007 WL 4239987, 2007 Cal.App. Unpub. LEXIS 9794 (Cal.Ct.App. Dec. 4, 2007); *Midwestern Indem. Co. v. Sys. Builders, Inc.,* 801 N.E.2d 661 (Ind.Ct.App. 2004); *Acuity v. Interstate Constr., Inc.,* No.2007–P–0074, 2008 WL 625097, 2008 Ohio App. LEXIS 896 (Ohio Ct.App. Mar. 7, 2008); *Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc.,* 916 A.2d 686 (Pa.Super.Ct.2007).[9] What Mattingly and Phoebus fail to recognize in referring us to the application of these cases to the instant dispute is that the AIA contracts in issue in those cases had additional completed project insurance clauses, specifically contemplating what to do in the event of losses occurring after the project was completed and paid for. According to one of the cases cited by Mattingly and Phoebus, an example of a completed project insurance clause was:

> *[I]f after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance*

---

**9.** Mattingly and Phoebus include several unreported opinions in their litany.

*with the terms of [the Waivers of Subrogation clause]* for damages caused by fire or other perils covered by this separate property insurance ...

*Silverton,* 948 P.2d at 11 (emphasis added).

In *Silverton,* the Town entered into an AIA form contract with a builder to install a new roof on the town hall. More than a year after the roof was completed and paid for, a fire severely damaged the building. The Town obtained compensation under a property insurance policy, and the insurer assigned its subrogation rights to the Town. Thereafter, the Town filed a complaint against the builder and several subcontractors, alleging that defective installation of a snow melting system had caused the fire. The trial court granted summary judgment in favor of the builder and subcontractors, reasoning that subrogation waivers in the contract prohibited the Town's claim. *Silverton,* 948 P.2d at 11. The Colorado intermediate appellate court affirmed, examining the waivers of subrogation and completed project insurance clauses in harmony. In so doing, the court emphasized that the completed project insurance clause specifically "provide[d] for a waiver of subrogation rights after final payment." *Id.* at 13.

Similarly, in *Colonial Properties,* 567 S.E.2d 389, a real estate developer, Colonial, hired a contractor to build an apartment complex. A year after the complex was complete, one of the apartment buildings was extensively damaged by a fire inadvertently started by a resident. Colonial's insurer paid the loss and filed a subrogation action against the contractor alleging negligent supervision, negligence per se, gross negligence, and breach of contract. The trial judge granted summary judgment in favor of the contractor, and the Georgia intermediate appellate court affirmed, reasoning that a waivers of subrogation clause and the completed project insurance provision in the AIA form contract, identical to that in *Silverton,* demonstrated that "the parties intended to provide for waiver of subrogation rights for losses occurring after the project was completed." *Id.* at 392.

In *TX. C.C.*, 233 S.W.3d 562, a restaurant owner entered into an AIA form contract with a contractor for the construction of a restaurant. Three years after the restaurant was complete, a fire caused by a faulty fireplace destroyed the restaurant. The restaurant owner was compensated under a property insurance policy, and the insurer filed a subrogation claim against the contractor and subcontractor, who installed the fireplace, for reimbursement. The Texas intermediate appellate court determined that the trial judge properly granted summary judgment in favor of the contractor and subcontractor, because the waivers of subrogation clause, interpreted in conjunction with the completed project insurance clause, identical to that in *Silverton*, specifically contemplated losses sustained after completion of construction and final payment. *Accord Argonaut*, 2007 WL 4554219, at *7, 2007 U.S. Dist. LEXIS 93846, at *26 (granting motions for summary judgment in favor of a contractor and subcontractor because a completed project insurance clause in the contract "ma[de] clear that the parties contemplated that the Owners would acquire additional insurance . . . and that the waiver of subrogation . . . would apply to those additional policies"); *Royal Surplus Lines*, 2006 WL 897078, at *4, 2006 U.S. Dist. LEXIS 16316, at *13 (noting a completed project insurance clause and waivers of subrogation clause "clearly extend the waiver [of subrogation] beyond completion of the contract if property insurance is obtained on the completed Project"); *American Guarantee*, 2007 WL 4239987, 2007 Cal.App. Unpub. LEXIS 9794 (reasoning owner and insurer could not bring claim against contractor for losses sustained more than four years after construction was complete, because of subrogation waiver and completed project insurance clause in form contract); *Midwestern Indem.*, 801 N.E.2d at 670 (holding an insurer's subrogation action was precluded by a subrogation waiver and completed project insurance clause, indicating that if the owner "obtained property insurance after project completion it would waive its rights against contractors and subcontractors"); *Acuity*, 2008 WL 625097, at *11, 2008 Ohio App. LEXIS 896, at *29 (interpreting a completed project insurance clause as indicating that if the owner purchased property

insurance "through a policy other than those policies insuring the project during the construction period, the owner waives all rights in accordance with the [waivers of subrogation clause] for [post-construction] damages"); *Universal Underwriters*, 916 A.2d 686 (reasoning a trial judge properly granted summary judgment in favor of a contractor and subcontractor because the owner obtained property insurance after the completion of construction and final payment pursuant to a completed project insurance clause).[10] *But see Lumbermens Mut. Cas. Co. v. Grinnell Corp.*, 477 F.Supp.2d 327 (D.Mass. 2007) (reasoning that although a form contract contained a completed project insurance clause, unless the parties plainly required the owner to obtain post-completion, post-payment property insurance, the contract language demonstrated an intention not to waive subrogation rights after completion and final payment).

---

**10.** Mattingly and Phoebus refer us to other cases which are similarly inapposite, as they do not consider whether a waivers of subrogation clause in an AIA form contract encompassed losses sustained after completion of construction and final payment. *See Weems v. Nanticoke Homes, Inc.*, 37 Md.App. 544, 378 A.2d 190 (1977) and *Brodsky v. Princemont Constr. Co.*, 30 Md.App. 569, 354 A.2d 440 (1976) (concerning waivers of subrogation in connection with losses sustained before completion); *General Cigar Co. v. Lancaster Leaf Tobacco Co.*, 323 F.Supp. 931 (D.Md.1971) (considering statute addressing insurance in context of tobacco storage); *see also Great Northern Ins. Co. v. Architectural Env'ts, Inc.*, 514 F.Supp.2d 139, 143 (D.Mass.2007) (considering only whether subrogation waiver "should be deemed unenforceable as a matter of public policy"); *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 275 Neb. 702, 749 N.W.2d 124 (2008) (considering whether subrogation waiver is effective against gross negligence claims and whether waiver applies to property not under renovation); *Acadia Ins. Co. v. Buck Constr. Co.*, 756 A.2d 515 (Me.2000) (considering, when a contractor was performing ongoing repairs, whether a subrogation waiver was enforceable); *Carlson Rests. Worldwide, Inc. v. Designline Constr. Servs., Inc.*, 2009 WL 2833259, 2009 N.J.Super. Unpub. LEXIS 2365 (N.J.Super.Ct.App.Div. Sept. 4, 2009) (considering whether owner could recover a $500,000 loss stemming from a post-construction, post-final payment restaurant fire not covered by insurance); *Penn Avenue Place Assocs. Ltd. P'ship v. Century Steel Erectors, Inc.*, 798 A.2d 256, 259 (Pa.Super.Ct.2002) (considering whether contractor and subcontractor could claim benefit of subrogation waiver when "their acts and omissions causing the loss violated an ordinance or regulation enacted for the protection of public safety").

In this regard, it seems disingenuous for Mattingly and Phoebus to assert that the Court of Special Appeals, in differentiating many of the same cases, inappropriately resorted to "extrinsic evidence" to discuss completed project insurance clauses. The ambiguity in the contract in issue was not created by the Court of Special Appeals, but by the definition of "the Work" in the waivers of subrogation clause.

Hartford, instead, urges us to embrace the reasoning of *Automobile Insurance Co. of Hartford v. United H.R.B. General Contractors, Inc.*, 876 S.W.2d 791 (Mo.Ct.App.1994), in which the Missouri intermediate appellate court considered the temporal scope of a waivers of subrogation clause in an AIA form contract that was not interrelated with a completed project insurance clause. In that case, as here, the contract contained a waiver of all claims "for damages caused by fire or other perils to the extent covered by . . . any other property insurance applicable to the Work." *Id.* at 792. The contract defined "the Work," in turn, as "compris[ing] the completed construction required by the Contract Documents." *Id.* at 793. The contract also contained a clause regarding final payment, similar to that in the present case, which provided:

The making of final payment shall constitute a waiver of all claims by the Owner except those arising from faulty or defective Work appearing after Substantial Completion.

*Id.* at 794. The court determined that the waivers of subrogation clause, when read in tandem with the definition of "the Work" and provision regarding final payment, was ambiguous. To resolve the ambiguity, the court gave preference "to the specific provisions over the general" and reasoned that the final payment provision was more specific than the waivers of subrogation clause, such that the subrogation waiver terminated upon completion of construction and final payment. *Id.* at 794–95.

We embrace the reasoning that the instant waivers of subrogation clause, with the definition of "the Work" included as one of its terms, is ambiguous, but we cannot reconcile the ambiguity without consideration of the parties' intent. Our

precepts of contract interpretation dictate that when faced with an ambiguous contract, "the court must consider extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Sy–Lene,* 376 Md. at 167–68, 829 A.2d at 547, quoting *County Comm'rs v. St. Charles,* 366 Md. at 445, 784 A.2d at 556; *see also Brendsel v. Winchester Constr. Co.,* 392 Md. 601, 624–25, 898 A.2d 472, 486 (2006) ("Only when the language of the contract is ambiguous will we look to extraneous sources for the contract's meaning. In that event, the intention of the parties must be established through relevant parol evidence or by strictly construing the clause against its author.").

**Proceedings on Remand**

 "It is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument," *Burroughs Corp. v. Chesapeake Petroleum & Supply Co., Inc.,* 282 Md. 406, 411, 384 A.2d 734, 737 (1978), or, in the case of a form contract, the proponent of the contract. *See, e.g., Fayetteville Investors v. Commercial Builders, Inc.,* 936 F.2d 1462 (4th Cir.1991). This principle is often referred to under the Latin term of *contra proferentem,* which literally means, "against the offeror, *he who puts forth,* or proffers or offers the language." Richard A. Lord, 11 Williston on Contracts § 32:12, at 472–75 (4th ed. 1999) (emphasis added). Although the Court of Special Appeals stated that "there is no such extrinsic evidence" shedding light on the meaning of the waivers of subrogation clause in the form contract, *Hartford,* 187 Md. App. at 679 n. 3, 979 A.2d at 305 n. 3, there may be other facts to explore, such as, primarily, who proposed the form contract used in the present case, among the various AIA forms that may have been available.

In *Fayetteville Investors,* the Fourth Circuit Court of Appeals considered the language of a performance bond,[11] guar-

---

11. A "performance bond" is defined as "[a] bond given by a surety to ensure timely performance of a contract," and "[a] third party's agree-

anteeing construction of a hotel owned by Fayetteville Investors. Although construction of the hotel was to be completed by November 1985, serious structural problems persisted, and the contractor and subcontractors continued work on the site until October 1987, when the contractor indicated that it would do no further work without additional payment. *Id.* at 1463. Pursuant to the terms of the performance bond, Fayetteville notified the surety of "Contractor Default" and subsequently filed a complaint against the surety. The trial judge dismissed the complaint, pursuant to a motion to dismiss filed by the surety, reasoning that the terms of the performance bond required that any such action be brought within two years, and the complaint alleged that "the Contractor abandoned the project in June, 1986," three years earlier. *Id.* at 1464.

In interpreting the phrase "Contractor Default," the court noted that "any ambiguities in the interpretation of the performance bond *must be construed against the party drafting or adopting the document*—in this case, the surety." *Id.* at 1465 (emphasis added). In so doing, the court emphasized that the surety proposed and used an AIA form performance bond, widely used in the industry. *Id.* & n. 3. As a result, the court reasoned that the terms of the performance bond "contemplated that a contractor would be afforded a reasonable time to ... make repairs and corrections," such that the trial judge improperly granted the surety's motion to dismiss, because the contractor actually continued work on the site as late as 1987. *Id.* at 1466. *See also Blue Cross of Southwestern Virginia v. McDevitt & Street Co.*, 234 Va. 191, 360 S.E.2d 825, 827 (1987) (reasoning that when the language of a form contract "arguably supports two antithetical interpretations," courts will construe any ambiguity against the architect or contractor "who supplied [the] printed forms"); *cf. Associated Eng'rs, Inc. v. Grand Elec. Coop., Inc.*, 370 F.2d 633, 650 n. 8 (8th Cir.1966) (noting ambiguities in a form contract should

ment to guarantee the completion of a construction contract upon the default of the general contractor." Black's Law Dictionary 1253 (9th ed. 2009).

not be construed against the contractor, because the contractor financed the construction with a Rural Electric Administration loan and was *not* "free to choose whether or not to use the REA form") (emphasis added).

 Accordingly, we remand this case to the Court of Special Appeals with directions to remand the case to the Circuit Court to more fully develop the record as to what the parties intended. Because Mattingly and Phoebus asserted the viability of the waivers of subrogation clause as a defense, they will be required to prove by a preponderance of the evidence that Hartford cannot assert a subrogation claim against them under the form contract; in doing so, consideration must be given to who proposed the form contract at issue in this case, as well as any other relevant evidence of the parties' intent.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. CASE REMANDED TO THAT COURT TO REMAND THE CASE TO THE CIRCUIT COURT FOR CALVERT COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**