Adkins, J.
Issues about an expert’s qualifications and foundation for his opinion are no strangers to appellate courts, and the complex issues of causation in lead paint cases generally require expert testimony, which is often challenged. Today we review a case in which the trial court excluded the plaintiffs *238 expert witness—a ruling fatal to his claim. We consider whether it erred in doing so.
FACTS AND LEGAL PROCEEDINGS
Respondent Michael Christian was born on February 12, 1990, From his birth until October 1992, he resided with his mother, Nickolas Skinner (“Nickolas”), and grandmother, Betty Skinner (“Betty”),[1] at 3605 Spaulding Avenue (“Spaulding”) in Baltimore City.[2] Christian and his mother then moved to 4946 Denmore Avenue (“Denmore”) in October 1992, where they resided for almost a year. In September 1993, Christian and his mother moved back to Spaulding and lived there for another four years, until September 1997.
Christian’s blood was tested eight times between November 1990 and October 1993. In April 1991, he exhibited an elevated free erythrocyte protoporphyrin (“FEP”) level, which does not measure a child’s blood lead level but is an initial screening test for lead exposure. From February 1992 to October 1993, Christian displayed elevated blood lead levels five times as follows:
Date Taken Blood Lend Level[3] Christian’s Address[4]
February 20, 1992 9 µg/dL Spaulding
February 18, 1993 10 µg/dL Denmore
July 16, 1993 17 µg/dL Denmore
September 2, 1993 12 µg/dL Denmore
October 6, 1993 14 µg/dL Spaulding
[Editor’s Note: The preceding image contains the references for footnotes 3, 4]
*239 In 2011, Christian filed suit in the Circuit Court for Baltimore City against Petitioner Stewart Levitas, the owner of Spaulding when he lived there, alleging negligence and violations of the Maryland Consumer Protection Act.[5] In February 2012, Arc Environmental, Inc. (“Arc”) tested the interior and exterior of Spaulding for lead using x-ray fluorescence testing. Arc summarized its findings in a report for Christian (“Arc Report”). Thirty-one interior surfaces and five exterior surfaces tested positive for lead. The lead-positive interior surfaces included door jambs, baseboards, and window sills, casings, and sashes. Exterior window sashes, casings, and door jambs also tested positive for lead.
During discovery, Christian designated Howard Klein, M.D., a pediatrician with experience treating lead-poisoned children, as an expert witness who would opine on the source of Christian’s lead exposure—source causation—and his lead-caused injuries—medical causation. As to the source of Christian’s lead exposure, Dr. Klein testified in his deposition that he was “of the opinion that [Christian] was exposed to lead- *240 based paint” at Spaulding. The basis for his opinion was: (1) the age of Spaulding—built in 1944; (2) the Arc Report; (3) a Maryland Department of the Environment (“MDE”) certification reflecting that the property was not lead free; (4) a Department of Housing and Community Development (“DHCD”) violation that detailed the poor condition of the property; (5) Christian’s elevated FEP and blood lead levels while he was living at Spaulding and Denmore; (6) Betty’s and Nicholas’s deposition testimony that Spaulding was in disrepair while Christian lived there; (7) Nicholas’s testimony that she saw Christian touch areas where paint was peeling around the windowsills at Spaulding; and (8) Nicholas’s testimony that Christian stayed at Spaulding under the supervision of family members while she was at worh during the day, both while they were living at Spaulding and while they were living at Denmore. Dr. Klein further testified that these facts establish that “there was lead-based paint [at Spaulding].” Finally, he achnowledged that Denmore was also a source of Christian’s lead exposure.
In his expert report on medical causation, Dr. Klein concluded “within [a] reasonable degree of medical certainty” that lead caused Christian’s mental retardation, impaired cognition, and learning disabilities. He further opined in his deposition that as a result of Christian’s exposure to lead, he lost 7.4 to 9.4 IQ points. Dr. Klein based his opinion on: (1) a neuropsy-chological evaluation of Christian by Barry Hurwitz, Ph.D.; (2) Christian’s medical records; (3) Christian’s Answers to Interrogatories; (4) information on Spaulding and Denmore; (5) Christian’s Maryland Department of Health and Mental Hygiene (“DHMH”) lead testing records; (6) MDE records; (7) DHCD records; and (8) Christian’s school records. To calculate Christian’s IQ loss, he relied on the Lanphear study,[6] which found that children with certain average lifetime blood lead levels lost a specific number of IQ points. Dr. Klein *241 averaged Christian’s blood lead levels and then determined his loss in IQ points based on the study’s results.
Levitas filed a motion to exclude Dr. Klein from testifying about source causation on the grounds that he lacked both the necessary qualifications and a sufficient factual basis for his opinion.[7] Levitas also moved for summary judgment in his favor if Dr. Klein were excluded.
On July 10, 2013, the Circuit Court held a hearing on Levitas’s motion to exclude Dr. Klein. At the hearing, Levitas argued that Dr. Klein should be precluded from testifying about both source causation and medical causation. Ruling from the bench, the hearing judge excluded Dr. Klein’s testimony on both of these topics. The court reasoned that Dr. Klein should be prevented from testifying about the source of Christian’s lead exposure because “he did not, or had very little ... information concerning other sources [of lead exposure].” [8] It also precluded Dr. Klein from testifying about the cause and extent of Christian’s injuries because he was not qualified and his opinion lacked a sufficient factual basis under Maryland Rule 5-702. As to his qualifications, the court reasoned that Dr. Klein would not be able to explain the IQ test results to the jury because he does not use the test in his own practice. As to his factual basis, the court explained that Dr. Klein relied on information from Dr. Hurwitz and Christian’s attorney in developing his opinion, rather than examining Christian himself, which was not sufficient. The Circuit Court declined to grant Levitas’s motion for summary judgment, however, because the Arc Report was “direct evidence” of lead at Spaulding.
*242 On August 20, 2013, the Circuit Court entered a written order precluding Dr. Klein from offering expert opinions on “source, IQ loss, alleged injuries due to lead, or other causation issues.”[9] For the purposes of appealing the Circuit Court’s decision to exclude Dr. Klein, the parties agreed that without Dr. Klein’s testimony, Christian could not make out a prima facie case of negligence because he could not establish medical causation. Therefore, the parties requested that the Circuit Court enter summary judgment in Levitas’s favor to allow Christian to appeal the expert’s exclusion.[10] The court granted the request, and Christian appealed.
In the first of two Court of Special Appeals opinions, the intermediate appellate court affirmed the Circuit Court’s decision to exclude Dr. Klein. Christian appealed to this Court, and we, in a per curiam order, vacated the judgment and remanded the case for reconsideration in light of Roy v. Dackman, 445 Md. 23, 124 A,3d 169 (2015), reconsideration granted, (Nov. 24, 2015). Christian v. Levitas, 445 Md. 240, 126 A.3d 71 (2015). On remand, the Court of Special Appeals, in an unreported opinion, reversed the Circuit Court’s decision to exclude Dr. Klein. Christian v. Levitas, 2016 WL 4076100, at *6 (Md. Ct. Spec. App. Aug. 1, 2016). It concluded that Dr. Klein was qualified and had a sufficient factual basis to opine that Christian was exposed to lead at Spaulding and that lead caused his injuries. Id. at *4-*5. Levitas appealed.
We granted certiorari to answer the following questions:[11]
*243 1. Did the trial court err in excluding Dr. Klein’s testimony regarding lead-source causation?
2. Did the trial court err in excluding Dr. Klein’s testimony regarding medical causation?
Because we answer these questions in the affirmative, we shall affirm the judgment of the Court of Special Appeals.
STANDARD OF REVIEW
It is often said that decisions to admit or exclude expert testimony fall squarely within the discretion of the trial court. See, e.g., Bryant v. State, 393 Md. 196, 203, 900 A.2d 227 (2006) (collecting cases). A discretionary ruling, however, is not boundless and must be tethered to reason. We have explained that an abuse of discretion is “discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.” Neustadter v. Holy Cross Hosp. of Silver Spring, Inc., 418 Md. 231, 241, 13 A.3d 1227 (2011) (emphasis added) (quoting Torzeau v. Deffinbaugh, 394 Md. 654, 669, 907 A.2d 807 (2006)). Appellate courts will not affirm a trial court’s discretionary rulings “when the judge has resolved the issue on unreasonable or untenable grounds.”[12] Id. (internal *244 quotation marks omitted). Such grounds include “when a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law.” Garg v. Garg, 393 Md. 225, 238, 900 A.2d 739 (2006) (citation omitted). The trial court must apply the correct legal standard and “a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion.” Neustadter, 418 Md. at 242, 13 A.3d 1227 (emphasis added).
Below we examine the Circuit Court’s rationale for excluding a crucial expert witness to assess whether it abused its discretion.
DISCUSSION
Levitas contends that the Circuit Court correctly excluded most of Dr. Klein’s testimony because he lacked a sufficient factual basis to opine about the source of Christian’s lead exposure and the nature and extent his injuries related to such exposure.[13] Christian flatly disagrees.
*245 Expert testimony is meant to assist the jury in resolving an issue outside the average person’s realm of knowledge. Roy, 445 Md. at 41, 124 A.3d 169 (citing Radman v. Harold, 279 Md. 167, 169, 367 A.2d 472 (1977)). Under Maryland Rule 5-702, expert testimony “may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.” The court bases this determination on three factors: “(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education^] (2) the appropriateness of the expert testimony on the particular subject[;] and (3) whether a sufficient factual basis exists to support the expert testimony.” Md. Rule 5-702.[14]
We have repeatedly explained that an expert may be qualified to testify if he “is reasonably familiar with the subject under investigation.” Roy, 455 Md. at 41, 124 A.3d 169 (emphasis added) (quoting Radman, 279 Md. at 169, 367 A.2d 472). This familiarity can come from “professional training, observation, actual experience, or any combination of these factors.” Radman, 279 Md. at 169, 367 A.2d 472. An expert, therefore, does not need to have hands-on experience with the subject about which he proposes to testify. Id. at 170-71, 367 A.2d 472 (citations omitted). The often-cited illustration of this concept is a law professor who is an expert in trial procedure even though she has never tried a case. Id. at 171, 367 A.2d 472 (citation omitted). Similarly, a doctor may be qualified to testify as a medical expert even though she does not have experience with a particular procedure or area of specialization. Id.
An expert’s testimony is admitted “because it is based on his special knowledge derived not only from his own experience, but also from the experiments and reasoning of *246 others, communicated by personal association or through books or other sources.” Id. at 170, 367 A.2d 472 (citation omitted). “It is sufficient if the court is satisfied that the expert has in some way gained such experience in the matter as would entitle his evidence to credit.” Id. at 169, 367 A.2d 472 (citation omitted). A trial court may not exclude an expert if “his reading can be assumed to constitute part of his general knowledge adequate to enable him to form a reasonable opinion of his own.” Id. at 170, 367 A.2d 472 (citation omitted).
Expert testimony must also have an adequate factual basis so that it is “more than mere speculation or conjecture.” Exxon Mobil Corp. v. Ford, 433 Md. 426, 478, 71 A.3d 105, as supplemented on denial of reconsideration, 433 Md. 493, 71 A.3d 144 (2013) (citation omitted). If an expert’s conclusions are not supported by an adequate factual basis, his opinion has no probative force. Beatty v. Trailmaster Prod., Inc., 330 Md. 726, 741, 625 A.2d 1005 (1993) (citation omitted). The probative value of an expert’s testimony is directly related to the “soundness of [the] reasons given” for his conclusions. Id. (citation omitted). An adequate factual basis requires: (1) an adequate supply of data; and (2) a reliable methodology for analyzing the data. Roy, 445 Md. at 42-43, 124 A.3d 169 (citation omitted); Ford, 433 Md. at 478, 71 A.3d 105 (citation omitted). In addition, if the facts and data that an expert relies on are “of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject,” they need not be independently admissible at trial. Md. Rule 5-703(a).
In assessing the expert-witness factors, the trial court is only concerned with whether the expert’s testimony is admissible. “[OJbjections attacking an expert’s training, expertise or basis of knowledge go to the weight of the evidence and not its admissibility.” Baltimore Gas & Elec. Co. v. Flippo, 112 Md.App. 75, 98, 684 A.2d 456 (1996), aff'd, 348 Md. 680, 705 A.2d 1144 (1998) (citation omitted). An expert’s qualifications and methods may be teased out during cross-examination, and the jury can then assess how much weight to give his testimo *247 ny. Roy, 445 Md. at 43, 124 A.3d 169. “Even if a witness is qualified as an expert, the fact finder need not accept the expert’s opinion.” Walker v. Grow, 170 Md.App. 255, 275, 907 A.2d 255 (2006).
Lead-Source Causation
The third factor in Rule 5-702—“sufficient factual basis”—garners the most debate between the parties. The Circuit Court restricted Dr. Klein’s testimony on the ground that he did not have a “substantial factual basis” for his opinion that lead inside Spaulding caused Christian’s elevated blood lead levels because he lacked “information concerning other possible sources.” Levitas asks us to affirm this ruling. Relying on Ross v. Housing Authority of Baltimore City, 430 Md. 648, 63 A.3d 1 (2013), Levitas argues that Dr. Klein could not conclude that Spaulding was a source of Christian’s lead exposure because he did not consider other properties or conduct an independent investigation.[15] We are not persuaded.
*248 Ross lends scant support to Levitas—markedly more facts underlie Dr. Klein’s opinion than were present in that case. In Ross, lead testing was conducted on the subject property, but the testing only detected lead-based paint on the exterior and one interior surface. Ross, 430 Md. at 654-55, 63 A.3d 1. The testimony of the expert, Pamela Blackwell-White, M.D., was quite equivocal—saying that if there was any lead-based paint in a property, she assumed it was the most probable source of lead exposure “until proven otherwise,” especially if it was built before 1970.[16] Id. at 660, 63 A.3d 1. Importantly, she testified that “she was merely identifying ‘potential risk’ and could not make any statement as to causation with certainty.” Id. at 664, 63 A.3d 1. We concluded that she lacked an adequate factual basis to opine that the subject property was the source of the plaintiffs lead exposure. Id. at 663, 63 A.3d 1. We reasoned that because Dr. Blackwell-White could not explain how she weighed certain pieces of information in reaching her conclusion, her opinion would confuse rather than assist the trier of fact. Id.
By contrast, Dr. Klein concluded—with a reasonable degree of medical certainty—that Spaulding was a reasonably probable source of Christian’s lead exposure for several reasons:
• The 2012 Arc Report found that 31 interior locations and five exterior locations tested positive for lead;
• Lead paint was banned federally in 1978, and therefore it was unlikely that Spaulding had been painted with lead-based paint since Christian lived there in the 1990s;
*249 • DHCD records described the poor condition of the property; [17]
• An MDE certification indicated that Spaulding was not lead free;
• Christian’s FEP and blood lead levels were first found to be elevated while he was living at Spaulding, when he had not yet lived anywhere else;
• Family members testified that Spaulding was in a deteriorated condition while Christian was living there and that Christian touched peeling paint at the property; and
• Christian regularly stayed at Spaulding during the day while his mother was at work, both when he lived there and when he lived at Denmore.
Dr. Klein acknowledged that Denmore was also a source of Christian’s lead exposure. Thus, unlike the expert in Ross, he did not jump to the conclusion that Spaulding was a source merely because it contained lead paint.[18] Spaulding’s lead *250 testing was one of multiple facts that Dr. Klein considered when developing his lead-source opinion.
The Dissent claims that expert witnesses in lead paint cases must exclude other properties to opine that a particular property was a substantial contributing factor to the plaintiffs injuries. Dissent Op. at 274-76, 164 A.3d 252-53. It also contends that the plaintiff must establish that “the subject property was a more probable source” of his injuries than other possible sources. Id. at 259, 164 A.3d at 244. Both of these assertions stem from a fundamental misunderstanding of the substantial factor test. The substantial factor test applies when “two or more independent negligent acts bring about an injury.” Pittway Corp. v. Collins, 409 Md. 218, 244, 973 A.2d 771 (2009). Under the test, an actor’s conduct is a cause-in-fact of the plaintiffs injuries when it is “a substantial factor in bringing about the harm.” Id. (quoting Restatement (Second) of Torts § 431 (Am. Law Inst. 1965)). The substantial factor test does not require experts to exclude other properties as possible contributing sources or the plaintiff to show that one cause had a greater impact than any other substantial factor causing the harm. See Eagle-Picher Indus., Inc. v. Balbos, 326 Md. 179, 209, 604 A.2d 445 (1992). It would be illogical for us to require an expert to narrow the plaintiffs lead exposure down to a single source when the substantial factor test, by its very definition, permits more than one cause of injury.
The discretion accorded to trial judges in evidentiary rulings calls for an exercise of judgment using applicable legal standards. Neustadter, 418 Md. at 241-42, 13 A.3d 1227. Here, the trial court excluded Dr. Klein’s proffered testimony about source causation because he had “very little ... information concerning other sources [of lead exposure].” In doing so, it thus relied on a purported rule of law that an expert must exclude other properties before he can testify that the plaintiff was exposed to lead at the subject property. But, as discussed supra, this is not the rule. Moreover, in Hamilton v. Kirson, *251 439 Md. 501, 96 A.3d 714 (2014), we dismissed concerns over the experts being “provided with little information on other potential sources of lead exposure.” Id. at 544, 96 A.3d 714. We explained, “[T]here may be other ways that an injured plaintiff may establish that it was probable that the interior of a subject house contained lead” besides eliminating other possible sources of lead exposure. Id. We have only required that an expert be able to adequately explain how he determined that a property was a source of the plaintiffs lead exposure so that the trier of fact can evaluate his reasoning. Ross, 430 Md. at 663-64, 63 A.3d 1 (citation omitted). By relying on the wrong legal standard, the trial court abused its discretion.
Medical Causation
The first factor of Rule 5-702—qualification by knowledge, skill, experience, training, or education—comes into play as we consider the Circuit Court’s exclusion of Dr. Klein’s testimony about the cause of Christian’s injuries. Although the parties dispute the exact grounds for this ruling, our examination of the record reveals that the Circuit Court precluded Dr. Klein from testifying about Christian’s injuries both on the grounds that he was not qualified and that he lacked an adequate factual basis. We assess both grounds below.
Levitas takes issue with the factual basis for Dr. Klein’s opinion that lead poisoning caused “[m]ental [retardation” and “[impaired cognition” in Christian. He argues that Dr. Klein should have conducted his own examination of Christian, rather than relying on Dr. Hurwitz’s report, scientific research, Christian’s school records, discovery materials, and deposition testimony. This argument reflects Levitas’s misunderstanding about the nature of—and boundaries for— expert testimony.
In a leading case on expert witness qualifications, Rodman v. Harold, we held that the trial court erred in precluding an internal medicine specialist from testifying about the standard of care for a hysterectomy because he had not “performed any *252 surgery of any kind, let alone in the specialty of gynecology and urology.” 279 Md. at 174, 367 A.2d 472. There, we explained, “[W]e perceive no reason why a person who has acquired sufficient knowledge in an area should be disqualified as a medical expert merely because he is not a specialist .... ” Id. at 171, 367 A.2d 472 (emphasis in original).
We recently reiterated in Roy the principle from Rodman— that an expert witness is “not required necessarily to be a specialist” or have “specialized knowledge,” but her opinion must be based on “reliable knowledge, skill, and experience.” Roy, 446 Md. at 43, 50, 124 A.3d 169; see also Md. Rule 5-702(1). In Roy, the expert witness, Eric Sundel, M.D., a board-certified pediatrician, had never studied or treated an individual with lead poisoning, but was well-read on lead poisoning and its effects on children.[19] Roy, 445 Md. at 33, 35, 124 A.3d 169. He testified in his deposition that lead exposure at the subject property had caused the plaintiff to suffer a loss of IQ points, impaired attention, and problems with memory and coordination. Id. at 33, 124 A.3d 169. Although we acknowledged that Dr. Sundel “may not be the most qualified expert witness on medical causation,” we nevertheless concluded that he was competent to testify about medical causation, and the trial court abused its discretion in excluding him. Id. at 43-44, 124 A.3d 169.
The record in this qase establishes that Dr. Klein has the “knowledge, skill, experience, training, or education” required under Rule 5-702(1). During his deposition, Dr, Klein testified that he was an attending physician at the University of Maryland for 25 years, during which time he treated lead-poisoned children. Additionally, he testified that he helps doctors in Israel, where he now practices, rule out lead poisoning as a cause of illness. He is also well-acquainted with Centers for Disease Control and Prevention and American *253 Academy of Pediatrics literature on lead poisoning, and he has been testifying as an expert witness in lead paint cases since 1995.
The Circuit Court precluded Dr. Klein from testifying about Christian’s IQ loss on the grounds that he did not administer the “particular type of IQ test” that Dr. Hurwitz used in his own practice and he is “not able to explain to the jury how [ ] the psychologist got to [his] results.” But physicians are often knowledgeable about many tests, even those they do not use. Knowledge about a broad spectrum of available tests is part of the training received by a physician—and this knowledge need not be acquired through hands-on experience. Rodman, 279 Md. at 170-71, 367 A.2d 472. In the lead paint litigation context, Roy makes clear that an expert need not administer the IQ test to be competent to testify that lead exposure caused a loss in IQ. In Roy, Dr. Hurwitz provided a neuropsy-chological report on the plaintiff. The expert, Dr. Sundel, did not administer the IQ test. Instead, he relied on Dr. Hurwitz’s report to conclude that the plaintiff suffered a loss of IQ points and other attention and memory impairments. Roy, 445 Md. at 33, 124 A.3d 169. We nevertheless held that Dr. Sundel was qualified to testify about the plaintiffs injuries. Id. at 52, 124 A.3d 169.
Like Dr. Sundel, Dr. Klein developed his opinion based in part on Dr. Hurwitz’s neuropsychological evaluation of Christian. Moreover, the record reflects that Dr. Klein was indeed familiar with and had previously graded the IQ test. He testified in deposition that he was “familiar enough with [the IQ test] to know how the test was generated,” had seen several editions of different IQ tests, and “[knew] the testing pretty intimately.” In short, Dr. Klein had ample knowledge, training, and experience to be qualified as an expert under Rule 5-702(1). We see no sustainable reason why the trial court would conclude otherwise.
We next focus on whether Dr. Klein had a sufficient factual basis to testify as to Christian’s IQ loss. Levitas submits that the court properly excluded Dr. Klein’s testimony *254 and takes issue with his reliance on Dr. Hurwitz’s neuropsy-chological report in developing his medical causation opinion, without meeting Christian, his family, his teachers, or his treating physicians. He also argues that Dr. Klein cannot calculate Christian’s IQ loss using the Lanphear study because it is population-based, and therefore cannot be used to calculate an individual’s IQ loss.
As we have established, an expert can rely on facts and data “of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.” Md. Rule 5-703(a). An expert’s factual basis “may arise from a number of sources, such as facts obtained from the expert’s first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions.” Sippio v. State, 350 Md. 633, 653, 714 A.2d 864 (1998); see also Rollins v. State, 161 Md.App. 34, 86, 866 A.2d 926 (2005), aff'd, 392 Md. 455, 897 A.2d 821 (2006) (an autopsy report prepared by another doctor provided a sufficient factual basis for a medical expert to opine on the victim’s cause of death). In Roy, this Court concluded that Dr. Sundel, who had also relied on a report from Dr. Hurwitz, was competent to testify regarding the medical causation of the plaintiffs injuries. Roy, 445 Md. at 51, 124 A.3d 169. Here, Dr. Klein similarly relied on a report from Dr, Hurwitz in developing his opinion on Christian’s lead-caused injuries. Based on our conclusion in Roy, Dr. Klein’s reliance was proper—and the Circuit Court arbitrarily exercised its discretion to exclude his testimony on that basis.
In Roy, Dr. Sundel also used the Lanphear study to calculate the plaintiffs individual IQ loss. The Roy defendants argued that the study could not provide a sufficient factual basis for Dr. Sundel’s IQ-loss opinion because other reputable studies contradicted the Lanphear study’s results and cautioned against using it to calculate individual IQ loss. Roy, 445 Md. at 51-52 n.16, 124 A.3d 169. We rejected this argument, explaining that “reliance on the Lanphear study does not invalidate the entire basis of [an expert’s] opinion, even if the *255 Lanphear study is contrary to the results of other studies .... Such is the grist for cross-examination and dueling experts and for resolution by the relative weight assigned by the fact-finder.” [20] Id. at 52, 124 A.3d 169. We reject Levitas’s argument for the same reasons.
Finally, Levitas contends that Dr. Klein lacked a sufficient factual basis for his opinion that Christian has "impaired cognition” due to: (1) a 10-point difference between the IQ scores computed for Christian by Dr. Hurwitz and the defense expert; and (2) Dr. Klein’s acknowledgment that there is no evidence of Christian being diagnosed with an “attention impairment” or a learning disability.[21] But these fact-based arguments go to the weight of Dr. Klein’s testimony, not its admissibility. See Ford, 433 Md. 426 at 481, 71 A.3d 105 (rejecting the argument that an expert’s testimony was inadmissible because he did not reach the same conclusions as the other party’s expert using the same data); Roy, 445 Md. at 43, 124 A.3d 169 (“Cross-examination is the usual crucible for persuading the fact-finder which witness merits the greater weight.”). As long as an expert’s opinion will assist the trier of fact in understanding the evidence or determining a fact at issue, he should be permitted to testify. See Md. Rule 5-702. Dr. Klein’s testimony would aid the jury in assessing the extent of Christian’s alleged injuries because determining a person’s IQ and calculating potential IQ loss are beyond the scope of the average juror’s realm of knowledge.
*256 CONCLUSION
Because Dr. Klein is competent to testify about lead-source causation and medical causation, the Circuit Court erred when it excluded his testimony. Therefore, we affirm the judgment of the Court of Special Appeals.
JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.
Getty, J., dissents.

. We use the Skinners’ first names to avoid confusion. We mean no disrespect.

. Respondent Michael Christian’s grandmother, Betty Skinner ("Betty’’), leased 3605 Spaulding Avenue ("Spaulding”) beginning in 1989. As of the date of her deposition on March 21, 2013, she still lived there.

. Blood lead levels are measured in micrograms per deciliter (µg/dL) of blood. See Standard Surveillance Definitions and Classifications, Centers for Disease Control and Prevention, https://www.cdc.gov/nceb/lead/ data/definitions.htm (last updated Nov. 18, 2016) [https://perma.ee/K4A 8-ZDKG], As of 2012, the Centers for Disease Control and Prevention considers blood lead levels greater than 5 pg/dL to be elevated. Id.

. We used the addresses and dates listed in Christian's Answers to Levitas's Interrogatories and Nickolas's deposition testimony as opposed to the addresses on the Maryland Department of Health and Mental Hygiene ("DHMH”) lab reports because this is the residential history Christian’s expert witness, Howard Klein, M.D., relied on when developing his lead source opinion. If we were to use the addresses on the DHMH lab reports, more of the reported elevated lead levels would correspond to his residence at Spaulding than at 4946 Denmore Avenue ("Denmore”). According to the lab reports, Christian lived at Denmore for the lead level reported on February 20, 1992 and lived at Spaulding for the three lead levels reported on February 18, July 16, and September 2, 1993.

. Christian also sued the owners of Denmore. His claims against them were dismissed with prejudice.

. Richard L. Canfield et al., Intellectual Impairment in Children with Blood Lead Concentrations Below 10 µg per Deciliter, 348 New Eng. J. of Med. 1517 (2003).

. Levitas also moved to exclude the Arc Environmental, Inc. test results ("Arc Report”) and "any testimony related thereto.” The Circuit Court for Baltimore City denied this motion. Levitas has not appealed that decision.

. The Circuit Court excluded Dr. Howard Klein’s lead-source causation testimony because he lacked a sufficient factual basis for his opinion, not because he was not qualified to offer an opinion on the subject.

. When the Circuit Court’s written order was entered, it erroneously denied Levitas’s motion to exclude Dr. Klein. Levitas timely filed a motion for reconsideration, requesting that the court amend the order to reflect its ruling from the bench. The court granted Levitas’s motion.

. The parties entered into an agreement which provided that "[Christian] intends to appeal the order(s) excluding Dr. Klein’s testimony, arguing ... that [he] is qualified to offer testimony as to the source and cause of [Christianas injuries due to lead ingestion, and also that Dr. Klein had a sufficient factual basis for his testimony.”

.We have rephrased the two questions presented in Levitas’s Petition for a Writ of Certiorari. His Petition included the following questions:
*243 1. Whether the Court of Special Appeals erred in reconsidering all issues in this case when this Court's order for "reconsideration in light of Roy [v. Dackman, 445 Md. 23, 124 A.3d 169 (2015), reconsideration granted, (Nov. 24, 2015),]” should have only impacted the issue of expert qualifications.
2. Whether the trial court abused its discretion in excluding Dr. Klein's testimony where the record showed that Dr. Klein did not have a sufficient factual basis to support either his opinion as to the source of lead exposure or the cause and extent of Mr. Christian’s alleged injuries.

. Not all evidentiary rulings are reviewed for an abuse of discretion. Judge McDonald, writing for the Court, explained the applicable standards of review for these rulings in Mathews v. Cassidy Turley Maryland, Inc., 435 Md. 584, 80 A.3d 269 (2013):
Some matters, such as the weighing of the relevance of proffered evidence as against unfair prejudice or other considerations, are left to the “sound discretion” of the trial court. Such decisions will be reversed only for abuse of discretion. Other evidentiary rulings are based on a "pure legal question.” In those circumstances, an appel *244 late court considers the legal question without deference to the decision of the trial court.
Id. at 599, 80 A.3d 269 (citations omitted). In that case, we reviewed de novo the trial court’s decision to exclude a bank examiner's report on the grounds that it was inadmissible hearsay. Id. at 628-32, 80 A.3d 269.

. Levitas also argues that the Court of Special Appeals should have only reconsidered Dr. Klein's qualifications, and not the factual basis for his testimony. Specifically, Levitas contends that Roy "did not evaluate the factual basis underpinning the expert's opinions,” and therefore it has no bearing on the outcome of this case. Levitas misreads Roy. The Court found the plaintiff’s expert, Eric Sundel, M.D., competent to testify about the plaintiff’s injuries based on his "academic and experiential qualifications” and the materials he relied on. Id. at 49-52, 124 A.3d 169. We held that Dr. Sundel was not competent to testify, however, regarding the source of tire plaintiff’s lead exposure because he lacked a sufficient factual basis. His opinion was “based solely on scant circumstantial evidence, including the age of the home and exterior tests of the paint on the dwelling at [the subject property].” Roy, 445 Md. at 47, 124 A.3d 169. Because our order instructed the Court of Special Appeals to reconsider its opinion "in light of Roy," without further instruction to confine its analysis to Dr. Klein’s qualifi *245 cations under 5-702(1), it was proper, on remand, for it to include consideration of the factual basis for Dr. Klein’s source testimony.

. This case implicates the first and third factors, although our discussion reverses that order.

. Levitas also relies heavily on City Homes, Inc. v. Hazelwood, 210 Md.App, 615, 63 A.3d 713 (2013). There, the plaintiff identified three properties as possible sources of lead exposure, but he only provided his expert witness, Eric Sundel, M.D., with information on one of them. Id. at 689, 63 A.3d 713, This information included Arc test results that found three lead-positive exterior surfaces and 19 lead-positive interior surfaces. Id. at 624-25, 63 A.3d 713. Based upon these results, Dr. Sundel opined that the property was a reasonably probable source of the plaintiff’s lead exposure. Id. at 688, 63 A.3d 713. Because he relied on the report and ignored other possible sources of lead exposure, the Court of Special Appeals concluded that Dr. Sundel lacked a sufficient factual basis for his lead-source opinion. Id. at 687-89, 63 A.3d 713. But here, Dr. IClein neither ignored the other identified possible source of Christian’s lead exposure nor relied solely on the 2012 Arc Report. Indeed, one of the reasons he concluded that Spaulding was a source of Christian’s lead exposure was that his FEP and blood lead levels were first found to be elevated while he was living at Spaulding, even though his blood lead levels were also elevated while he was living at Denmore. Additionally, we have never held that an expert witness cannot rely on information obtained from other sources. All that we require is an adequate supply of data and a reliable methodology for assessing that data. Roy, 445 Md. at 42-43, 124 A.3d 169 (citation omitted); Exxon Mobil Corp. v. Ford, 433 Md. 426, 478, 71 A.3d 105, as supplemented on denial of reconsideration, 433 Md. 493, 71 A.3d 144 (2013) (citation *248 omitted). To the extent that Hazelwood is inconsistent with this proposition, we disagree with that aspect of its analysis.

. Evidence also showed that the plaintiff in Ross v. Housing Authority of Baltimore City, 430 Md. 648, 63 A.3d 1 (2013), could have been exposed to lead from several possible sources, but the expert, Pamela Blackwell-White, M.D., concluded that the subject property was the only source of the plaintiffs lead exposure. Id. at 664, 63 A.3d 1. In this case, by contrast, Denmore was the only other possible source identified—and the facts show that Dr. Klein considered it when he reached his conclusion.

. In Dr. Klein’s deposition testimony, he acknowledged that the Department of Housing and Community Development (“DHCD”) records were from after Christian lived at Spaulding. But given Betty’s and Nicholas’s testimony about the poor condition of Spaulding while Christian lived there and the lack of evidence of repairs in the intervening years, it was reasonable for Dr. Klein to consider these records.

. Levitas makes two additional points. He asserts that the Arc Report is not direct evidence of "lead paint hazards” while Christian lived at Spaulding, but merely evidence of the presence of lead at the property in 2012. He contends that there must be contemporaneous evidence of such hazards, like citations from the Baltimore Housing Department, for Dr. Klein to have a sufficient factual basis to conclude that Spauld-ing was a reasonably probable source of Christian’s lead exposure. We have never imposed such a requirement. Rather, the adequacy of an expert’s factual basis turns on whether he had a sufficient supply of data and a reliable methodology. Roy, 445 Md. at 42-43, 124 A.3d 169 (citation omitted); Ford, 433 Md. at 478, 71 A.3d 105. As we explained, supra, Dr. Klein's source causation opinion satisfied these requirements.
Levitas also claims that “Christian targeted [Spaulding], then provided Dr. Klein with information pertaining only to that property.” Levitas mischaracterizes the record. Dr. Klein's own report lists the records *250 that he reviewed in developing his opinion. On that list is ‘'[property information for 3605 Spaulding Avenue [and] 4946 Denmore Avenue.”

. Dr, Sundel is the same expert the Court of Special Appeals held was properly excluded in Hazelwood. The Roy Court distinguished the record in that case from the record in Roy, noting that he had "endeavored to be more specific and shore-up the supposed deficiencies in his qualifications." Roy, 445 Md. at 50, 124 A.3d 169.

. We also acknowledged that the Lanphear study "has been cited to and discussed extensively by other studies employing similar tests relating to IQ loss and childhood lead poisoning.” Roy, 445 Md, at 51, 124 A.3d 169; see also id. at n.16 (listing some of the books and journals that have cited the Lanphear study),

. Levitas claims that "Dr. Klein conceded that the results of Dr. Hurwitz’s evaluation of Christian were ‘suspect’ ” because Christian admitted to using marijuana and alcohol daily. Therefore, Levitas contends, Dr. Hurwitz’s report could not provide an adequate factual basis for Dr. Klein's testimony. Levitas has taken Dr, Klein's testimony out of context. Speaking only to marijuana use, Dr. Klein testified that the "memory function” portion of Dr. Hurwitz’s report "might be suspect.” This is grist for cross-examination and does not affect admissibility.